# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

**JACK D. DENTON,**

     Plaintiff,

                          Case No.: 4:20-cv-00425-AW-MAF

v.

**JOHN E. THRASHER, President of
Florida State University, in his official
and individual capacities, et al.,**

     Defendants.

_____/

## DEFENDANT THRASHER, HECHT AND BOWDEN'S MOTION TO DISMISS COMPLAINT WITH PREJUDICE AND SUPPORTING MEMORANDUM OF LAW

Defendants, **JOHN E. THRASHER**, in his official and individual capacities ("President Thrasher"); **AMY HECHT**, in her official and individual capacities ("Vice President Hecht"); and **BRANDON BOWDEN**, in his official and individual capacities ("Director Bowden") (collectively, the "Administrator Defendants" or "Administrators"), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and N.D. Fla. Loc. R. 7.1, move to dismiss the Complaint [(Doc. 1)] filed by Plaintiff, **JACK D. DENTON** ("Denton" or "Plaintiff"), with prejudice.

## I.      **Introduction and Facts Pertinent to the Motion**

This case involves a classic student government scuffle between Plaintiff and his fellow student senate members. Essentially, Plaintiff contends the United States

Constitution has been violated because Florida State University ("FSU" or the "University") administrators have not stepped in to referee or inject themselves and the University into the melee and reinstate Plaintiff to his former post as student senate president.

There is no statutory duty to rescue Denton from an intra-student government fight. Far from it - Florida law is clear that the University is immunized from liability for student government squabbles such as this one. Nor does the U.S. Constitution compel the Administrators to override what Plaintiff has characterized as political maneuvering by student government members. As Judge Wetherell noted while he was a member of the First District Court of Appeal, "student government is an extracurricular activity – not real government – and it is well-settled that students have no constitutionally protected right to participate in extracurricular activities."[1]

FSU has not been unsympathetic to Denton's circumstances and has not ignored his concern. Indeed, Vice President Hecht wrote the student senate to express her disappointment in the student government's failure to appoint a

---

[1]   *Fla. A&M Univ. Bd. of Trustees v. Bruno*, 198 So. 3d 1040, 1044-45 (Fla. 1st DCA 2016).

- 2 -

sufficient number of justices to the student supreme court. (Doc. 1-11). FSU's Office of General Counsel advised Denton's attorneys that the University was hopeful the student senate would act so that his appeal could proceed through proper channels. (Doc. 10-1). Ultimately, four out of five seats have now been filled, with the fifth expected to be confirmed tomorrow.[2]  Even if that does not occur, FSU's student body constitution permits the student supreme court chief justice to appoint a fifth student justice by designation. (Doc. 1-1 at p. 9, Art. IV, § 3(A)(4)). In either event, Denton's appeal to the student supreme court may be heard.

Plaintiff's contention that the University and Administrators had a constitutional duty to throw itself and themselves into the controversy between Denton and his peers is unsupported, and squarely at odds with the reason student governments exist at all – to serve as laboratories for students considering a career in politics and public life, a place where hard lessons are often learned, coalitions of voting blocs often come together to support or oppose individuals and ideas, and

---

[2]  *See*, Administrators' Response to Emergency Motion for Preliminary Injunction at Hecht Affidavit.  A district court may consider extrinsic evidence in ruling on a motion to dismiss "if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd. V. Banc of America Securities, LLC*, 600 F. 3d 1334, 1337 (11th Cir. 2010); *see also*, *Brown v. Brock*, 169 F. App'x 579, 582 (11th Cir. 2006).

students learn how to resolve and oppose conflicts between them. *Bruno*, 198 So. 3d at 1045 n.8 (citing, *inter alia*, *Ala. Student Party v. Student Gov't Ass'n of the Univ. of Ala.*, 867 F. 2d 1344, 1347 (11th Cir. 1989)).

Plaintiff certainly has the right to use the processes established by the University to challenge what his fellow student senators did to him; however, he does not have a constitutional right to insist that the University disregard those processes for the sake of expediency. Nor does Plaintiff have the statutory or constitutional right to compel the University and Administrators to pick sides in the culture war Plaintiff ignited and to which the vast majority of his fellow senators countered by lighting a fuse of their own. That fight was fought in the laboratory of student government and that is where the fight should remain – between Plaintiff and his student government colleagues.

Specific to the Administrator Defendants – all of whom have been sued in their individual and official capacities[3] – the allegations upon which Denton bases his theories of liability are:

--------------------

[3]   While there are certainly meatier issues presented to the Court, by suing each Administrator Defendant in his/her official capacity Plaintiff has effectively sued FSU 3 times. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quotation omitted).

**President Thrasher**

- President Thrasher has "supervisory authority" over all of the University's activities and adopts all University policies. (Complaint at ¶¶ 18-19).

- "Upon information and belief" President Thrasher knows Plaintiff was removed from his position in student government and the circumstances surrounding the removal. (Complaint at ¶ 127).

- "On information and belief" President Thrasher has the authority to insert himself into the affairs of student government and direct the FSU Student Senate to follow University policies and state and federal law. (Complaint at ¶ 23).

- President Thrasher "has authority over" all FSU Vice Presidents. "On information and belief" President Thrasher knows that Denton asked Vice President Hecht to bypass the Student Supreme Court's review of the dispute and reinstall Denton as Student Senate President. President Thrasher also has the "authority and the obligation" to direct Vice President Hecht to put Denton back into his former role as Student Senate President. (Complaint at ¶¶ 24, 181-182).

**Vice President Hecht**

- Vice-President Hecht approves all SGA legislation and is President Thrasher's representative in student life and governance matters. (Complaint

at ¶¶ 25, 29).  She oversees the Division of Student Affairs, which includes the Department of Student Government & Advocacy ("DSGA") and supervises Director Bowden. (Complaint at ¶¶ 26, 34).

- Vice-President Hecht has certain specific authority relative to student government (the authority to approve or veto the budget passed by the Student Senate), adjudicate disputes arising from "charges of any act by a student organization in violation of laws, rules, regulations, policies or procedures." (Complaint at ¶ 31).

- She has authority to hear an appeal of any decision by the Student Supreme Court. (Complaint at ¶ 32). "On information and belief" Ms. Hecht has the authority to "order" student government participants to comply with the law and University policy, but failed to intervene. (Complaint at ¶¶ 33, 126).

**Director Bowden**

- Like Vice President Hecht, "on information and belief" Director Bowden has the authority "order" students participating in student government to comply with the law. (Complaint at ¶ 37).

- "On information and belief" as the Interim Director of the DSGA, Director Bowden has the power to intervene, but did not do so. (Complaint at ¶131).

## II.   Argument and Authority

**A.   Plaintiffs Lack Standing to Maintain This Action**

### 1.   *Fundamental Standing Principles*

The authority of the United States District Courts is limited by Article III of the United States Constitution.  *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 470 (1982).  Those who seek to invoke the jurisdiction of the federal courts "must satisfy the threshold requirement by Article III of the Constitution by alleging an actual case or controversy."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).

Indeed, Federal courts do not have the authority to "seek out and strike down any governmental act that they deem to be repugnant to the Constitution." *Jay F. Hein ,White House Office of Faith-Based and Community Initiatives v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587, 598 (2007). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).

The constitutional requirements for a federal court to adjudicate a case are accompanied by prudential requirements. *See, e.g., Bennett v. Spear*, 520 U.S. 154,

162 (1997). These constitutional and prudential requirements form the doctrine of standing. *Id.*; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Plaintiffs bear the burden of establishing standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive stages of the litigation," and establishes a "case or controversy" for Article III standing purposes where he has suffered an "injury in fact," an invasion of a legally protected interest which is concrete and particularized and actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560-61 (1992).

In addition to the injury component, a plaintiff must plead and prove that that the injury suffered is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). A Federal court must analyze the realities of the litigation against these three prongs (injury-in-fact, traceability and redressability) and "satisfy themselves that the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009) (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975)). "[S]tanding is a threshold jurisdictional question which must be addressed prior to

and independent of the merits of a party's claims." *Swann v. Secretary*, 668 F.3d 1285, 1288 (11th Cir. 2012) (citations and quotations omitted).

Although this pleading burden is not insurmountable, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). Further, to survive dismissal a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

### 2.    *Plaintiff Cannot Establish Traceability*

Plaintiff's claims against the University and Administrators do not establish Article III standing because the actions of Plaintiff's fellow student senators are not fairly traceable to these Defendants. Any injury allegedly suffered by the Plaintiff from his removal as student senate president is exclusively tied to the independent actions of Plaintiff's fellow student senators. Neither FSU nor the Administrators took any action against Plaintiff because of his speech or his religious beliefs. That student senators chose to fight over sensitive societal issues within the student government arena does not establish standing against the University and the

Administrators. Put another way, Plaintiff cannot drag FSU and its Administration into his fight with his fellow student senators because he lacks standing to do so.

The failure to establish traceability based on the lack of an affirmative action should end the standing inquiry; however, Denton will no doubt argue that the Administrator Defendants' and University's failure to step in, overturn the actions of the student senate, purge (that is, destroy) records related to Plaintiff's removal and restore him to his position pursuant to the broad authority given to the Administrators is, without more, sufficient. Fortunately, last year and then again earlier this month, the Eleventh Circuit squarely addressed the traceability element of standing in the face of allegations that a government entity failed to act or correct unconstitutional conduct.

In _Lewis v. Governor of Ala._, 944 F. 3d 1287 (11th Cir. 2019) (_en banc_), the Eleventh Circuit considered Article III standing in a case arising out of "a political tug-of-war between the State of Alabama and the City of Birmingham over economic policy – in particular, over minimum wage rates." _Id_. at 1292.  The Birmingham City Council adopted a resolution calling upon the Alabama Legislature to raise the statewide minimum wage at a rate exceeding that prescribed by federal law. The Legislature refused. In response, the City enacted its own

ordinance. *Id*.  The following year, the Legislature considered and ultimately passed a preemption bill declaring such ordinances void; however, while the bill travelled through the legislative process, the City passed a second ordinance immediately raising the minimum wage 39%, provided an enforcement mechanism through a private right of action, and levied fines against non-compliant businesses. *Id*. at 1292-93. Birmingham's mayor signed the ordinance into effect, however the very next day the preemption bill was signed into law by the governor. *Id*. at 1294.

Rather than suing their employers for ordinance violations, the plaintiffs sued the Alabama Attorney General and several other government entities for race discrimination under the Equal Protection Clause of the Fourteenth Amendment and sought to enjoin enforcement of preemption law. *Id*. at 1294-95. The district court dismissed the claim as to all defendants for lack of standing, but a panel of the Eleventh Circuit reversed, finding that plaintiffs had standing to sue the Alabama Attorney General because his "broad authority to interpret and enforce" the preemption law provided the sufficient causality to plaintiffs' injuries. *Id*. at 1295. The panel also found "an order declaring the Act unconstitutional and enjoining the Attorney General from enforcing it 'would go a long way toward redressing the plaintiffs' injuries,'" that the Attorney General "had a sufficient connection to the

enforcement of the Act to render him a proper defendant under *Ex ParteYoung*," and that the plaintiffs "adequately alleged discriminatory intent" to state a race based Equal Protection claim against the Attorney General. *Id*.

Sitting *en banc*, the Eleventh Circuit reversed the panel's decision on several fronts (including standing), finding that the traceability and redressability elements had not been satisfied. With respect to the traceability element, the court organized its opinion under two standing theories alleged by the plaintiffs – *ex ante* and *ex post* traceability. *Id*. at 1296-1301.

➔ With respect to *ex ante* traceability – the plaintiffs' contention that the Attorney General "refused to perform his statutory duty to inform" the governor and Legislature that the law was unconstitutional – the court found that the broad authority granted the Attorney General by various Alabama statutes did not create a legal duty "to inform anyone of anything" vis-à-vis the constitutionality or unconstitutionality of the Act. *Id*. at 1297-98.

➔ As for the *ex post* traceability element – that because the Attorney General under his "specter of enforcement" *could* enforce the Act, either under the Act itself or other statutes granting broad authority to bring civil actions "necessary to protect the rights and interests of the state", but was not taking such action, the City of

Birmingham faced a roadblock to implementing the minimum wage ordinance. This, the plaintiffs argued, satisfied the traceability requirement. The court rejected this as well, noting that under the plaintiffs' theory, if statutes provided general enforcement power to the Attorney General to enforce any Alabama law were sufficient to confer standing *to them* to sue the Attorney General "then the Attorney General could be made a proper party defendant under innumerable provisions of the Alabama Code." *Id*. at 1300.

*Lewis* is analogous with respect to the "failure to act/failure to stop/failure to correct" theory underlying the Complaint's allegations against the Administrators. Denton's theory regarding why the University and Administrators are liable under Section 1983 – they possess broad power under FSU's regulations but are not using it, to Plaintiff's detriment – is substantially the *ex ante* theory espoused by the *Lewis* plaintiffs.

Moreover, as *Lewis* noted with respect to the *ex post* theory, if a public official with broad enforcement powers fails to act in a manner with which an aggrieved individual desires, that official can be sued for almost anything. *See also*, *Doe v. Pryor*, 344 F. 3d 282, 1283 (11th Cir. 2003) (holding traceability element was not met where the Alabama Attorney General "ha[d] taken no action to enforce" the

- 13 -

State's law regarding "deviate sexual intercourse"), *cited with approval in Lewis*, 944 F. 3d at 1298; *see also, Jacobson v. Fla. Sec'y of State*, No. 19-14552, 2020 WL 5289377, at *12 (11th Cir. Sept. 3, 2020)(holding that plaintiff failed to establish Article III standing because secretary of state's position as "the chief election officer of the state," with "general supervision and administration of the election laws," was insufficient to establish that the alleged harm suffered by ballot ordering initiative controlled by an independent government official was fairly traceable or capable of being redressed by secretary). The same holds true with respect to the general authority given by regulation to the Administrators. Following *Lewis* and the more recently issued decision in *Jacobson,* this Court should exercise the appropriate restraint and find that the injury alleged by Plaintiff is not traceable to FSU and the Administrator.

### 3.    *Plaintiff Cannot Establish Redressability*

*Lewis* is also on point with regard to the lack of redressability of Denton's claims. The court began its analysis of the redressability question by asking if a decision in plaintiffs' favor "would significant[ly] increase the likelihood that she would obtain relief that directly redresses the injury that she claims to have suffered." *Id.* at 1301 (citation and quotations omitted). Second, the Court stated that

"it must be the effect of the court's judgment on the defendant – not an absent third party – that redresses the plaintiff's injury, whether directly or indirectly." *Id*. (citations and quotations omitted).

Assessing the redressability factor in the context of these two principles, the court found that the requested relief against the Attorney General would not significantly increase the likelihood that Birmingham employers would follow the ordinance. Rather, the court stated that the plaintiffs' "immediate gripe is wither their employers, who aren't paying the prescribed wages" and that Birmingham employers would not be "obliged" in "a binding sense" to "honor an incidental legal determination to the suit produced." *Id*. at 1301-02 (citing *Luhan*, 504 U.S. at 569); *see also*, *Jacobson*, 2020 WL 5289377, at *12 (following *Lewis*).

The court also addressed indirect or "downstream" redress finding that a judgment against the Attorney General would not bind Birmingham employers at all. *Id*. at 1303. The court was persuaded that even if there were no redressability concerns and relief was entered against the Attorney General, Birmingham employers would likely find other methods to circumvent the court's non-binding judgment, noting that "we're just not convinced that Birmingham employers would go quietly into the night." *Id*.

The same is true here. FSU's student government is a statutorily-created entity that, while not possessing unbridled authority, is entitled to make its own decisions without overt intrusion by the University. Only two student senators are parties to this action, and unless this Court is willing to: (1) compel the Administrator Defendants and the University to act; and (2) act in the manner demanded by the Plaintiff, what assurance would the parties or this Court have that the remainder of the student senate would "go quietly into the night" and reverse its vote? Would the student senate find other grounds to enter a vote of no confidence thereby undermining both the Court's judgment and the directive given by the Administrator Defendants acting in accord with that judgment? It would not be the first time college students bucked the system, and illustrates the lack of redressability of what Denton asks this Court to do vis-à-vis the University and Administrators.

**B.     Plaintiff's Supervisory Authority Claim Fails as a Matter of Law**

The core theme of Plaintiff's case is that because the Administrator Defendants have *general* authority over the University (President Thrasher) and student affairs (Vice President Hecht and Director Bowden), supervisory liability attaches for an action taken against a student (Denton) by other students (FSU's

student senate).[4] Plaintiff's theory of liability is incongruent with well-settled precedent interpreting the scope of supervisory liability under Section 1983.

Supervisory officials are not liable under § 1983 for the alleged unconstitutional acts of those under their supervision on the basis of *respondeat superior* or vicarious liability. *Hartley v Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999); *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994). "[T]he mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 n. 58 (1978) (citing *Rizzo v. Goode*, 423 U.S. 362, 370–371 (1976)).

"The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1266 (11th Cir. 2010). "Supervisor liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Braddy v. Fla. Dep't of Labor & Employment*

---

[4]  *See,* Doc. 1 at ¶¶ 18-26; 29-35; 37; 126; 129; and 131.

_Sec._, 133 F.3d 797, 802 (11th Cir. 1998); _see also_, _Salepour v. Univ. of Tennessee_, 159 F. 3d 199, 206-207 (6th Cir. 1998) (stating that university president and chancellor were not subject to supervisory liability absent showing they encouraged or condoned actions).

Plaintiff has not alleged that any of the Administrators were personally and specifically involved in the constitutional deprivation at issue - his removal as senate president. A supervisor cannot be held liable under Section 1983 under a negligence theory. _Accord_, _Greason v. Kemp_, 891 F. 2d 829, 836-37 (11th Cir. 1990). Thus, he can only establish liability on the part of the Administrator if he can show a "causal connection" between their actions and his removal from the senate president post. There is no such connection as a matter of law, based on the facts in the Complaint.

While the Complaint contains buzzwords suggesting the Administrators may be held liable for failing to intervene or stop the alleged constitutional violation, the Complaint lacks any facts establishing the Administrators had the specific authority, or a statutory or constitutional duty to intervene or stop the complained of conduct. This is fatal to the Plaintiff's theory that the Administrators can be held liable for a failure to intervene or stop the alleged constitutional violation because a causal connection can only be established in this circumstance where a supervisor has the

ability to prevent or stop a "known constitutional violation *by exercising his supervisory authority* and he fails to do so." *Am. Fed'n of Labor & Cong. of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1190 (11th Cir. 2011) (emphasis supplied); *Keating v. City of Miami,* 598 F.3d 753, 765 (11th Cir. 2010).

Plaintiff claims the Administrators' general authority over Student Government and conduct at FSU provided it the authority to intervene in this specific dispute within student government. But this general and broad authority is insufficient to establish the causal connection required to support liability under Section 1983. A nexus between the violation of federal law and the individual accused of violating that law requires more than simply a broad general obligation to prevent a violation; it requires an actual violation of federal law by that individual. *See*, *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (holding that the *Ex Parte Young* doctrine applies when state officials act in violation of state law); *Am. Fed'n of Labor & Cong. of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1190 (11th Cir. 2011) (holding that the connection between the harm and actor must be "fairly direct" to result in supervisory liability and a "generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision" is not sufficient).

Requiring a more demanding nexus than what has been pled here, as this precedent requires, is for good reason. To permit liability against government actors based on a general authority to prevent injury by their subordinates would allow the *Ex Parte Young* exception to swallow the rule. Much like the standing argument set forth above, plaintiffs could merely name a state official as a defendant to challenge any alleged unconstitutional action to seek redress, a result the law does not allow. *See*, *Women's Emergency Network v. Bush*, 323 F.3d 937, 949–50 (11th Cir. 2003) (citations omitted) (holding that governor was not proper defendant in suit challenging state law and noting that if "a governor's general executive power provided a sufficient connection to a state law to permit jurisdiction over him, any state statute could be challenged simply by naming the governor as a defendant."); *Support Working Animals, Inc. v. DeSantis*, No. 4:19CV570-MW/MAF, 2020 WL 1991479, at *8 (N.D. Fla. Apr. 27, 2020) (holding that secretary of state was not proper defendant in case challenging constitutionality of state law because nexus, the secretary's general supervisory and administrative powers and authority to expunge unconstitutional laws from the official records of the state, was an insufficient connection to the harm and would render *Ex Parte Young* meaningless). In other words, Plaintiff's theory of liability, as pled, would functionally make FSU

liable for any allegation of wrongdoing in breach of federal law at the student government level.

Moreover, the Florida Legislature clearly did not envision liability for state universities for student government activities under a *respondeat superior* theory of liability and codified this notion in Section 1004.26(5). Indeed, that statute contemplates lawsuits such as this one involving an attempt to impose liability on a state university for the "actions or decisions" of student governments. § 1004.26(5), Fla. Stat. (2020). Absolute immunity is provided to state universities for the actions of a student government unless: (1) the action or decision of the student government "is made final" by the university; and (2) the action or decision is an actual violation of state or federal law. *Id*.

To be sure, no action or decision of the student government has been "made final" by the University, despite Plaintiff's contention that the removal decision was ratified or enforced by the Administrator Defendants. Plaintiff's theory in this regard stems from his allegation that the student senate refused to confirm a full complement of supreme court justices for the purpose of stalling the adjudication of his complaint challenging his removal as senate president. Through counsel, Plaintiff wrote Vice President Hecht claiming that the senate's failure to confirm supreme

court justices amounted to a denial of his complaint permitting him an administrative appeal to Vice President Hecht's office. Plaintiff claims that the failure to act on this "appeal" amounted to an adoption or ratification of the student senate's decision.

This argument is belied by the fact Plaintiff had no direct appeal to the Vice President's office and FSU told him as much. Indeed, FSU and Vice President Hecht responded to Plaintiff, through counsel, informing him that FSU would not undertake a review of his "appeal" because he had not obtained a decision from the student supreme court on his complaint, a condition precedent to University review. The student supreme court's rules require the student supreme court to issue a decision on a complaint before that decision may be appealed to the Vice President's office. The University's recognition that it had no duty or authority to involve itself in the student government complaint process before a necessary step had been completed was not a ratification of the alleged unconstitutional decision of the student senate – it was a recognition of the process that limits University involvement in student government affairs.

It is telling that the Complaint does not cite any specific authority authorizing the Administrator Defendants to overturn the student senate's vote and reinstate Denton as senate president. Plaintiff's attempt to hold the Administrator Defendants

liable through a ratification by inaction theory because they did not act to his satisfaction has been rejected by the Eleventh Circuit:

> Liability on the basis of ratification exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority … The final policymaker, however, must ratify not only the decision itself, but also the unconstitutional basis for it.

_Matthews v. Columbia Cty._, 294 F.3d 1294, 1297–98 (11th Cir. 2002) (internal citations and quotations omitted). Crucially, the Administrator Defendants, through counsel, expressly disclaimed adopting the student senate's decision to remove Plaintiff from his post as senate president, or the alleged unconstitutional basis for that decision. And no action of any of the Administrator Defendants can be characterized as policymaking by any stretch.

To be sure, the ratification theory is typically employed in cases asserting Section 1983 liability against a local governmental entity as a means to impute the decisions of final policymakers to municipalities. _See_, _Monell_, 436 U.S. 658. The foregoing assumes such a theory of liability applies in the context of _Ex Parte Young_ actions. This theory of liability is inapposite here, because the _Ex Parte Young_ exception is built on the concept that an officer enforcing an unconstitutional law is stripped of his official or representative character and thus subjected in his person to

the consequences of *his individual conduct.* 209 U.S. at 159-160 (emphasis added). Indeed, "[t]he theory of the case was that an unconstitutional enactment is 'void' and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984) (quoting *Young*, 209 U.S. at 160). Thus, the *Ex Parte Young* exception is based on the pre-existence of unconstitutional conduct *by the individual.* If there is no unconstitutional conduct *by the individual* sued, the exception is inapplicable. This is the reason that such actions only lie to essentially stop the enforcement of ongoing constitutional harm with the only remedy being prospective injunctive relief.

## C.     Plaintiff's Official Capacity Claims are Barred by Sovereign Immunity

The constitutional claims brought pursuant to Section 1983 against the Administrators in their official capacities are barred by the Eleventh Amendment. While technically styled as *Ex Parte Young* claims, that legal fiction should not apply here.

The Eleventh Amendment has been interpreted by the Supreme Court to forbid lawsuits brought by citizens of a state against their own state in federal courts under most circumstances. Congress may abrogate state sovereign immunity if it has

unequivocally expressed its intent to abrogate the immunity and if it has acted pursuant to a valid exercise of power. *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55 (1996). The doctrine of sovereign immunity has been interpreted to bar suits against an unconsenting state brought by private parties regardless of the nature of the relief sought. *See*, *Id*.; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

Sovereign immunity, as embodied in the Eleventh Amendment, precludes actions brought pursuant to Section 1983 against state entities for money damages and for injunctive relief. Indeed, state entities and state officials sued in their official capacities are not "persons" subject to suit under Section 1983. *See*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989). The state of Florida has not waived its immunity to suits under Section 1983. *See*, *Gamble v. Fla. Dep't of Health & Rehab. Servs.*, 779 F.2d 1509, 1513-20 (11th Cir. 1986).

Nevertheless, as the Court is aware the Eleventh Amendment and the doctrine of sovereign immunity does not preclude suits against state officers in their official capacity for prospective injunctive relief. *Ex Parte Young*, 209 U.S. 123 (1908); *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). This is because such suits, including suits under Section 1983, are not treated as suits against the state itself.

- 25 -

*Will*, 491 U.S. at 71 n. 10.

The *Ex Parte Young* doctrine creates a legal fiction allowing a claim against a state officer to redress continuing violations of federal law. *Verizon Md. Inc. v. Public. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). However, *Ex Parte Young* cannot "operate as an exception to ... sovereign immunity where no defendant has any connection to the enforcement of the challenged law at issue." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999). Thus, before the exception applies, the "state officer [named as a defendant in his official capacity must have] the authority to enforce an unconstitutional act in the name of the state." *Id.* Where the named defendant lacks any responsibility to enforce the statute or scheme at issue the real party in interest is the state and the suit remains barred by the Eleventh Amendment. *Id.*

The Administrator Defendants do not have any authority to enforce the alleged unconstitutional act and do not have a connection sufficient to support an *Ex Parte Young* claim to proceed against them in their official capacities. Again, the student government at FSU is a civics laboratory for students to learn about the democratic process. FSU does not have the specific authority or duty to involve itself in or enforce the decisions of the student government, if at all, unless and until issues

involving student government are properly placed before FSU's administration. That has not happened here.

While Plaintiff has alleged that a sufficient connection between the Administrator Defendants and the alleged unconstitutional act exists by virtue of the Administrator Defendants' broad and general authority over student government at FSU, that is insufficient to state an _Ex Parte Young_ claim as a matter of law. It is settled law that general executive authority, without a specific authority connecting the defendant to harmful act, is not sufficient to provide a connection to the alleged unconstitutional action for _Ex Parte Young_ purposes. _See_, _Women's Emergency Network,_ 323 F.3d at 949–50 (finding governor's executive general responsibility for enforcement of a statute and "general executive power" insufficient to establish a sufficient connection to the statute making him a proper defendant for _Ex Parte Young_ purposes where the enforcement of the statute is the responsibility of parties other than the governor); _accord_, _Harris v. Bush,_ 106 F.Supp.2d 1272, 1276–77 (N.D.Fla.2000) (Collier, J.) ("Article IV, § 1 of the Florida Constitution vests Governor Bush with executive power to enforce the laws. However, this general authority, standing alone, is insufficient to make him the proper party whenever a plaintiff seeks to challenge the constitutionality of a law.").

Based upon the lack of specific authority or connection to the alleged unconstitutional action, the fiction of _Ex Parte Young_ as a basis for the claims against the Administrator Defendants in their official capacities, simply does not hold water. _See_, _Osterback v. Scott,_ 782 F. App'x 856, 858–59 (11th Cir. 2019) (holding that suit against the Governor of Florida in his official capacity was barred by sovereign immunity and not subject to _Ex Parte Young_ exception because, while the Governor had constitutional and statutory authority to enforce the law and oversee the executive branch, the responsibility for the enforcement of a challenged provision rested with the Division of Administrative Hearings). The reality here is that Denton has sued the State of Florida, and the challenge lodged against the Administrator Defendants in their official capacities is barred.

**D.     Plaintiff's Claims are not Ripe**

As of the filing of the Complaint and this Motion, Plaintiff has not fully exhausted the procedures implemented by student government to challenge his removal as student senate president. While neither FSU nor the Administrator Defendants are legally obligated to get between Denton and his senate colleagues with respect to the war they have waged on difficult social issues, the fact is that,

consistent with Section 1004.26(5) and the appeal process that allows students to appeal the ruling of the student supreme court, these Defendants have not had the issue properly before them for consideration.

The ripeness inquiry "goes to whether the district court ha[s] subject matter jurisdiction to hear the case." _Greenbriar, Ltd. v. City of Alabaster_, 881 F. 2d 1570, 1573 n. 7 (11th Cir. 1989). "Strict application of the ripeness doctrine prevents federal courts from rendering impermissible advisory opinions and wasting resources through review of potential or abstract disputes." _Adver. Co. v. City of Miami_, 402 F. 3d 1335, 1339 (11th Cir. 2005). Further, one of the bedrocks principles of the ripeness doctrine "is to protect the [administrative] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. _Id_. (citations and quotation omitted).

The urgency with which Plaintiff asks this Court to act is only an issue because of the date Plaintiff alleges his senate presidency would have concluded. But that is not enough to invoke this Court's jurisdiction nor does it make Denton's claims ripe. The advisory opinion Plaintiff seeks through this lawsuit should be denied and the action dismissed for lack of jurisdiction.

- 29 -

**E.      Plaintiff's Challenge to His Inability to Have His Appeal Heard by the Student Supreme Court is Moot**

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." _Powell v. McCormack_, 395 U.S. 486, 496 (1969).  The requirement that a case have an actual, ongoing controversy extends throughout the pendency of the action.  _See_, _Preiser v. Newkirk_, 422 U.S. 395, 401 (1975) (quoting _Steffel v. Thompson_, 415 U.S. 452, 459 n. 10 (1974)). "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." _Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc._, 528 U.S. 167, 189 (2000) (quoting _United States v. Concentrated Phosphate Export Assn._, 393 U.S. 199, 203 (1968)).

Insofar as Plaintiff's claims are based on the student senate's decision not to confirm supreme court justices and Vice President Hecht's recognition that she lacked the authority to hear any appeal unless or until the supreme court rendered its decision pursuant to established process, those claims are moot. By tomorrow the student supreme court should be fully seated with a sufficient number of justices to hear Denton's appeal, and, failing that, the chief justice may appoint a fifth justice to sit by designation.

- 30 -

**F.    Plaintiff's Individual Capacity Claims Against the Administrator Defendants are Barred by Qualified Immunity**

*1.    Qualified Immunity is Denied Only in Exceptional Circumstances*

Critical public policy considerations, such as the "social costs [associated with claims against public officials] including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office" are bedrock principles of the qualified immunity defense. *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). These and other considerations have led the Eleventh Circuit to caution that "courts should think long and hard before stripping defendants of immunity." *Lassiter v. Ala. A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*en banc*). "[O]nly in exceptional cases will government actors have no shield against claims made against them in their individual capacities." *Id*. at 1149. The issue of whether qualified immunity applies is a question of law. *Skrtich v. Thornton*, 280 F.3d 1295, 1306 (11th Cir. 2002).

A public servant is entitled to immunity unless her act is "so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Rehberg v. Paulk*, 611 F.3d 828, 838 (11th Cir. 2010) (quoting *Lassiter*). Moreover, "[b]ecause

qualified immunity is a defense not only from liability, but also from suit," both the Supreme Court and Eleventh Circuit have repeatedly emphasized the "importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (per curiam)); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (stating that qualified immunity is "*immunity from suit* rather than a mere defense to liability") (emphasis supplied); *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation and internal quotation omitted).

Finally, and importantly, the protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (citations omitted). Indeed, qualified immunity "operates as a shield against civil damages due to mistaken judgments." *Harris v. Coweta Cty.*, 21 F.3d 388, 390 (11th Cir.1994) (citations omitted). Stated differently, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 17 (2014) (per curiam).

### 2.    Two-Step Analysis Applicable to Qualified Immunity

To receive qualified immunity, a public official must first establish he "was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194. If the defendant makes this showing, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate. *Lumley v. City of Dade City, Fla.*, 327 F.3d 1186, 1194 (11th Cir. 2002). To do so, a plaintiff must satisfy both prongs of the two-part test set forth by the Supreme Court: (1) that plaintiff has alleged a violation of a constitutional right; and (2) whether the right was "clearly established" at the time of the defendant's misconduct. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 236 and *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (citation omitted)). The steps in the test may be considered in whatever order is deemed appropriate for the case. *Pearson*, 555 U.S. at 241-242.

### 3.    The Administrator Defendants Were Acting in their Discretionary Authority

"[A] government official proves that he acted within his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir.

1991) (internal quotation marks omitted); *see also*, <u>Holloman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004) (stating an official acts within her discretionary authority where she "perform[s] a legitimate job-related function…through means that [are] within his power to utilize"). The actions and inactions alleged by Plaintiff all implicate the discretionary authority of the Administrator Defendants.

**President Thrasher**

The Complaint fails to allege a direct, positive or specific act in which President Thrasher supposedly engaged that violated Plaintiff's constitutional rights. Plaintiff is careful to steer clear of such allegations in his verified Complaint, alleging, instead, that "upon information and belief" President Thrasher knows about his predicament, but has not injected himself into the dispute, or direct others to do so. (Doc. 1 at ¶¶ 18-19; 23-24; 127; 181-182). Assuming, *arguendo*, President Thrasher – as Plaintiff alleges – knows about the dispute and made a conscious decision not to inject FSU or its administration into a student government conflict, or take sides with Plaintiff over the decided will of the FSU student senate, then that is clearly an act within the President's discretionary authority.

**Vice President Hecht**

Plaintiff acknowledges Vice President Hecht took action by issuing a

memorandum to the student senate reminding them of the senate's obligation to appoint the student supreme court. Plaintiff's theory of liability is that more was required – an action to overturn the near unanimous decision of the duly elected representatives of the student body. Whether and, if so, to what extent Vice President Hecht was obligated to undertake this course of action is a decision within her discretionary authority.

**Interim Director Bowden**

Director Bowden was not responsible for student government affairs when the student senate deposed Plaintiff from his position. Again, the Complaint carefully tip toes around whether Director Bowden knew about the decision to remove Plaintiff, again alleging "upon information and belief" [(Complaint at ¶ 130)], but as the Affidavit makes clear Director Bowden had no authority – discretionary or otherwise – to exert at or around the time of the vote. With respect to Plaintiff's allegations concerning Director Bowden's failure to inject himself or FSU into a student senate fight [(Complaint at ¶ 211)], that decision is, once again, an act within his discretionary authority.

### 4.      *The Administrators Did Not Violate Clearly Established Law*

With respect to the second element Plaintiff must satisfy, "[q]ualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, —— U.S. —— , 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna,* 577 U.S. ——, 136 S.Ct. 305, 308 (2015)).  While Supreme Court precedent "'do[es] not require a case directly on point'" for a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at 551; *Mullenix*, 136 S.Ct. at 308 (quotation omitted).  As the Eleventh Circuit instructs, "[t]his second inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Lee*, 284 F.3d at 1194 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from on other grounds*, (*Pearson*, 555 U.S. at 236). Further, in the Eleventh Circuit qualified immunity attached when a plaintiff alleges a government actor failed to take a particular action. *Jackson v. Humphrey*, 776 F. 3d 1232, 1246 (11th Cir. 2015)(Martin, J. dissenting) (recognizing "that qualified immunity can attach to inaction just as it does to actions.") (citation omitted).

The undersigned are unaware of any decision that places the challenged

- 36 -

actions "beyond debate" for purposes of the clearly established law prong of the qualified immunity analysis. Plaintiff cannot cite to any case holding that a university president, vice president or student services director is compelled to intervene in a student government dispute to reinstate an aggrieved student to an elected office based upon an alleged First Amendment violation, particularly where there are internal self-help measures available to the student-plaintiff to seek to overturn the action. In fact, the Eleventh Circuit has found qualified immunity appropriate where university administrators do not intervene in student on student disputes. *See*, <u>*Alexander v. Univ. of North Fla.*</u>, 39 F. 3d 290, 292 (11th Cir. 1994) (reversing denial of qualified immunity based upon university administrators' failure to act to protect student from fellow student assailant).

In a more general sense, the reasonable university administrator at a public college or university would be guided by principles such as:

- Students do not enjoy the constitutional right to participate in extra-curricular activities[5];

---

[5]  *See*, *e.g.*, <u>*Bruno*</u>, 198 So. 3d at 1044-45; <u>*Flint v. Dennison*</u>, 488 F.3d 816, 835–36 (9th Cir.2007) (finding constitutionally valid application of regulation barring student from assuming office in student government for campaign overspending); <u>*O'Brien v. Welty*</u>, No. 1:12-cv-2017, 2013 WL 2300920, at *17 (E.D. Cal. May 24,

- Student government is a civics laboratory in which student on student disputes often arise[6];

- Judicial reluctance to interfere with the administration of student affairs within post-secondary institutions[7];

- Through Section 1004.26, the Florida Legislature charges student governments with adopting internal procedures including including the qualifications and removal of student government officers;

- Florida law recognizes that unless a university adopts the position taken by student government, Section 1004.26(5) protects the university from the actions of the student government.

The qualified immunity defense is particularly appropriate for cases like this.

---

2013), *aff'd in part, rev'd in part on other grounds,* 2013 WL 2300920 (9th Cir. 2016) ("there is no constitutionally protected property interest in extracurricular activities generally and in student government office in particular").

[6]   *Ala. Student Party*, 867 F. 2d at 1347.

[7]   *Ala. Student Party*, 867 F. 2d at 1347 ("The University judgment on matters such as this should be given great deference by federal courts. This Court should honor the traditional 'reluctance to trench on the prerogatives of state and local educational institutions.'") (quoting *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 226 (1985)).

The law generally recognizes the deference that should be given university administrators for student affairs matters, but even if it did not, qualified immunity applies to immunize the actions (or inactions) of the Administrator Defendants.

Dated this 22nd day of September, 2020.

/s/ Robert J. Sniffen
**ROBERT J. SNIFFEN**
Florida Bar Number: 0000795
rsniffen@sniffenlaw.com
/s/ Jeffrey D. Slanker
**JEFFREY D. SLANKER**
Florida Bar Number: 100391
jslanker@sniffenlaw.com
**ELMER C. IGNACIO**
Florida Bar Number: 537683
eignacio@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Counsel for President John E. Thrasher, in His Official and Individual Capacities; Vice President Amy Hecht, in Her Official and Individual Capacities; and Interim Director Brandon Bowden, in His Official and Individual Capacities*

- 39 -

## **WORD COUNT CERTIFICATION**

The undersigned certifies that this document complies with word limits set forth in N.D. Fla. Local Rule 7.1(F), as it contains 8,396, which includes the headings, footnotes, and quotations, but does not include the case style, signature block or Certificates of Word Count and Service.

/s/ Robert J. Sniffen
**ROBERT J. SNIFFEN**


## **CERTIFICATE OF SERVICE**

The undersigned certifies that on this 22nd day of September, 2020, a true and correct copy of the foregoing was electronically filed in the United States District Court, Northern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Robert J. Sniffen
**ROBERT J. SNIFFEN**

- 40 -