IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JACK D. DENTON,

     Plaintiff,

v.                                 Case No. 4:20-cv-425-AW-MAF

JOHN E. THRASHER, President of
Florida State University, in his official
and individual capacities, et al.,

     Defendants.

_____/

## ORDER GRANTING IN PART MOTION
## FOR PRELIMINARY INJUNCTION

Jack Denton is a student at Florida State University. He is a member of the Catholic Student Union and—until recently—served as the student senate president. This summer, in a private group chat, he expressed views he finds "consistent with the teachings of the Roman Catholic Church." *See* Verified Complaint (Compl.) ECF No. 1 ¶ 83. His private messages soon became public, and the reaction was swift and severe. His fellow student senators called for his ouster, referring to Denton's comments as "abhorrent," "offen[sive] and scandal[ous]," and bigoted. After a 38-3 vote, Denton was no longer senate president.

Denton sued. He contends his removal violated his constitutional rights. He alleges First Amendment retaliation, First Amendment discrimination, and a Free Exercise violation. *See generally* Compl. Through his emergency motion for

1

preliminary injunction, he seeks an order reinstating him as president, prohibiting FSU from recognizing—or giving effect to—the student vote, prohibiting FSU from recognizing anyone else as student senate president, and other specific relief. ECF No. 13 ¶ 4. The defendants filed responses in opposition, and the court held a hearing. This order grants some relief, but not all of what Denton seeks.

## I.

There is no real dispute about the facts (at least at this stage), and no party sought an evidentiary hearing. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1313 (11th Cir. 1998) ("[W]here material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.").

Denton is Catholic and believes his faith calls him to public service. Compl. ¶¶ 50, 65-66. Following that call, Denton successfully ran for a seat in the FSU student senate, and in 2019, his senate colleagues elected him senate president. ¶¶ 65-69. His term was supposed to continue through this October, and the position came with modest compensation.[1] ¶¶ 132-38; ECF No. 13-2 (Denton Dec.) ¶¶ 8-10, Sept. 4, 2020.

---

[1] The student senate president receives $9.00 per hour and may work up to five hours per week during the summer and seven-and-a-half hours per week during the fall. ¶ 132. The verified complaint says Denton would have worked the maximum hours during the summer and six hours weekly during the fall for the remainder of his term. ¶¶ 133, 135.

While serving in the student senate, Denton also belonged to the FSU Catholic Student Union, where he engaged with other members. Compl. ¶¶ 70-78. Denton opposes abortion, ¶¶ 52-53, believes that "human beings are male and female," ¶ 60, and views marriage "as a permanent, exclusive, and monogamous union between one man and one woman," ¶ 61.

Members of the Catholic Student Union had a private group chat thread going on the GroupMe application. ¶¶ 5, 71-72; ECF No. 1-9 at 4. This June—as the discussion addressed instances of police violence—one member shared a YouTube link relating to fundraising efforts. Compl. ¶¶ 73-74; ECF No. 1-9 at 4. Another member responded by sharing a list of the organizations the video supported. ¶ 75; ECF No. 1-9 at 4. Denton chimed in, saying, "[t]he various funds on that list are fine causes as far as I know, but everyone should be aware that BlackLivesMatter.com, Reclaim the Block, and the ACLU all advocate for things that are explicitly anti-Catholic." ¶ 76; ECF No. 1-2 at 4; ECF No. 1-9 at 4. Some then asked what he meant, and Denton said this:

> BlackLivesMatter.com fosters "a queer-affirming network" and defends transgenderism. The ACLU defends laws protecting abortion facilities and sued states that restrict access to abortion. Reclaim the Block claims less police will make our communities safer and advocates for cutting PDs' budgets. This is a little less explicit, but I think it's contrary to the Church's teaching on the common good.

Compl. ¶ 77; ECF No. 1-2 at 5. After other students responded and the discussion continued, Denton offered this:

> I don't mean to anger anyone – I know this is a very emotional topic.
> However, it is important to know what you're supporting when you're
> Catholic. If I stay silent while my brothers and sisters may be
> supporting an organization that promotes grave evils, I have sinned
> through my silence. I love you all, and I want us all to be aware of the
> truth. As far as it's a religious issue or not, there isn't an aspect of our
> lives that isn't religious, because God wants our whole lives and
> everything we do to be oriented around him!<3

Compl. ¶ 78; ECF No. 1-2 at 14.

A student took screenshots of the conversation and posted them on social media, and word quickly spread. Compl. ¶¶ 87-89. The student senate happened to have a meeting that same day, and a student senator moved for a vote of no confidence against Denton, explaining that she felt "offended and scandalized" by Denton's "rhetoric." ¶¶ 90-91; ECF No. 1-3 at 3. Another student senator said that she felt "hurt that [Denton] thought it was okay to say something homophobic in a Catholic chat thinking it was a 'safe space.'" Compl. ¶ 95; ECF No. 1-3 at 5.

Although the no-confidence motion had majority support, it fell short of the required two-thirds. Compl. ¶ 96. But the effort to remove Denton continued. ¶¶ 97-99. In the span of days, an online petition calling for Denton's removal garnered more than six thousand signatures. ¶ 98. Just two days after the initial vote, the student senate entertained a second no-confidence motion. ¶¶ 99, 108. This time the motion passed easily; the vote was 38-3. ¶ 119. Denton remains a student senator, but the vote took away his presidency. Defendant Ahmad Daraldik replaced him. ¶ 109.

"[S]tudent government is an extracurricular activity—not real government." *FAMU Bd. of Trs. v. Bruno*, 198 So. 3d 1040, 1044 (Fla. 1st DCA 2016). It has been described "as a 'learning laboratory,' [that] allows students who 'aspire to public service, public life, [and who] want to gain some experience and expertise in better understanding the way in which democracy functions,' an opportunity to learn how to work within the democratic process." *Ala. Student Party v. Student Gov't Ass'n of the Univ. of Ala.*, 867 F.2d 1344, 1347 (11th Cir. 1989); *see also Flint v. Dennison*, 488 F.3d 816, 821 (9th Cir. 2007) (describing student government as "an invaluable educational tool for students of the University"). So although FSU gives some decision-making authority to the student government, university administrators unsurprisingly reserve to themselves the final say on important issues.

FSU's student government can pass "legislation," but none becomes effective until FSU administrators approve it. Compl. ¶¶ 20-21, 29 & n.6 (citing Fla. State Univ. Bd. of Trs. Regulation FSU-3.001(3)).[2] The student government can allocate student-activity fees (some $13 million annually), but FSU administrators get a veto on that, too. ¶¶ 22 & n.2 (citing FSU-3.035(5)(g)), 30. And the student government

---

[2] Denton has cited the FSU Board of Trustees Regulations, which are available at https://regulations.fsu.edu/regulations/adopted-regulations. I will take judicial notice of them.

does not raise its own money; when leaders like Denton are paid, it is university administrators who facilitate payment. ECF No. 13-2 ¶¶ 8, 9.

Even decisions to remove leaders—like the decision to remove Denton—are not left solely to the student legislators. Under the governing documents, senators voted out can appeal to the FSU student supreme court. *See* FSU Constitution of the Student Body (FSU Const.) (ECF No. 1-1), Art. IV, § 3(C)(1). But the student supreme court's decisions, like so much else, remain subject to administrators' approval. Compl. ¶¶ 21; 31 & n.7 (citing FSU-3.0015(13)); 32 & n.8 (citing Fla. State Univ. Student Sup. Ct. R. Proc. 3.8)).

After his colleagues voted him out, Denton appealed to the student court. ¶ 148. But the court could not consider the case because it was short on student justices and lacked a quorum. ¶¶ 149-50. Denton wrote to Dr. Amy Hecht, Vice President for Student Affairs, requesting the appointment of temporary justices, or alternatively, that Dr. Hecht decide the appeal herself. ¶ 151. Dr. Hecht did not respond, but the student senate met to consider nominations for temporary justices. ¶¶ 152-55. After one senator noted a "sensitive case" coming up and explained that she was uncomfortable with the nominee's presiding "over this case," though, the senate adjourned for the summer without approving any nominee. ¶¶ 159, 161. The student court, therefore, remained unavailable to hear Denton's appeal. ¶ 161.

6

Denton then wrote Dr. Hecht a second letter, asking her to reinstate him as senate president and arguing that his removal violated the First Amendment. ¶¶ 162-67; ECF No. 1-9 at 7. Dr. Hecht responded (through the general counsel's office), saying she had no authority to undo the vote.[3] Compl. ¶¶ 168-69. She said "the University shares Mr. Denton's frustration at the failure of the Student Senate to debate and confirm those appointed to serve as Supreme Court Justices in order to hear his case." ECF No. 1-10. And to that end, she also wrote to the student senators, criticizing them for leaving open the supreme court seats. ECF No. 1-11. But she maintained she could not comment on the substance of Denton's argument because the issue belonged at the student supreme court. Compl. ¶¶ 171-78; ECF No. 1-10; ECF No. 1-11.

The supreme court never heard Denton's appeal. And the university never reinstated him. Thus, this lawsuit and preliminary injunction motion.

---

[3] The parties disagree about whether Dr. Hecht had the authority to rule on Denton's appeal. Denton says that Student Supreme Court Rule 3.8 gives her that authority. That rule says this:

> Any decisions of the Student Supreme Court may be appealed to the Vice President of Student Affairs. See the Student Government Advisor for further details concerning an administrative appeal or contact the Office of the Vice President of Student Affairs.

Dr. Hecht was the Vice President of Student Affairs, but FSU maintained that there was no process for appealing directly to Dr. Hecht without first going through the student court. ECF No. 1-10.

## II.

A preliminary injunction is an extraordinary and drastic remedy, available only if the movant clearly establishes entitlement. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Because preliminary injunction motions often turn on undeveloped records, it can be difficult for movants to meet this high standard. *Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000) (en banc). Accordingly, preliminary injunctions are usually the exception, not the rule. *Id.* at 1176.

To obtain a preliminary injunction, a movant must clearly establish (1) a substantial likelihood of success on the merits, (2) that he will suffer irreparable injury without an injunction, (3) that the threatened injury outweighs damage the injunction may inflict on the nonmovant, and (4) that the injunction would not be adverse to public interest. *ACLU*, 557 F.3d at 1198. A failure to satisfy any one factor is fatal. *Id.* Here, I conclude Denton has made a sufficient showing as to each.

## A. Denton Has Shown a Substantial Likelihood of Success on the Merits.

The first requirement—that the plaintiff show a substantial likelihood of success on the merits—is "generally the most important." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005).

*1.*

A threshold issue is whether Denton has shown state action. "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (marks and citation omitted). The real question is this: "is the alleged infringement of federal rights fairly attributable to the State?" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (marks and citation omitted). Here, the answer is yes, state action caused Denton's removal.

The student senate—like all of FSU's student government—is a creature of state statute. *See* Fla. Stat. § 1004.26(1) ("A student government is created on the main campus of each state university."). And it is not some wholly independent entity: as a matter of Florida law, "[e]ach student government is a part of the university at which it is established." *Id.* When the student government acts, therefore, it does so under the color of state law. *See Ala. Student Party v. Student Gov't Ass'n of the Univ. of Ala.*, 867 F.2d 1344, 1345 (11th Cir. 1989) (affirming judgment that noted student government "was a state actor subject to the same constitutional restrictions as the University itself"); *Koala v. Khosla*, 931 F.3d 887, 894 & n.1, 904 (9th Cir. 2019) (finding that student activity fund was a limited public forum and Eleventh Amendment did not bar action alleging that student group had been denied funding in violation of the First Amendment); *Flint v. Dennison*, 488

9

F.3d 816, 825 (9th Cir. 2007) (finding state action where student government restricted campaign expenditures); *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 365-66 (8th Cir. 1988) (concluding that "[s]tate action was present" in the student government's funding decision because the student government was a "creation[] of the State" and "the University did have final say over [Student] Senate funding decisions"). Regardless, FSU's administration acts under color of state law, and Denton alleges that the administration violated his rights independent of the student government by giving effect to the students' decision.

*2.*

A second (and related) question is whether Denton has sued proper defendants. He sued five people: three university administrators and two student senators—all in their individual and official capacities.

John Thrasher is the President of FSU and he is "the Chief Administrative Officer of the University and [has] general supervision over all its activities." FSU-1.004(1)(a); FSU Const. Art. IV, § 4(a) (saying the President "is the ultimate authority in matters of student conduct; discipline and the promulgation of rules, regulations and policies for student governance"); Compl. ¶¶ 18-20 & n.2.

Dr. Hecht is the Vice President of Student Affairs, ¶ 25; ECF No. 4-1 ¶ 2, and she "is the designated representative of the University President in matters pertaining to student life and governance," FSU-3.001(1). All student senate legislation and

budget allocations are subject to her approval and she has the final say over decisions of the student supreme court. FSU-3.001(3); FSU Student Body Statutes §§ 401.6, 402.2 (ECF No. 45-2); Fla. State Univ. Student Sup. Ct. R. Proc.; 3.8 (ECF No. 45-4); FSU Const. Art. II § 6.

Dr. Brandon Bowden works under Dr. Hecht as the Associate Vice President for Student Affairs, but when Denton was removed, Dr. Bowden was in a different position. ECF No. 45-5 ¶2; Compl. ¶¶ 27-28, 34. In his former role, Dr. Bowden was in charge of disbursing the student senate president's pay. Denton Dec. ¶ 8, Sept. 4, 2020. He now provides support to the student senate on parliamentary matters, but he does not comment on the merits of the students' decisions. ECF No. 45-5 ¶¶ 5-7.

Ahmad Daraldik was the student senate president pro tempore, and he took over as president after Denton's ouster. Compl. ¶¶ 38, 45, 109; ECF No. 48-1 ¶¶ 2, 4. Alexander Harmon is currently the president pro tempore. Compl. ¶ 47. ECF No. 48-2 ¶¶ 4, 6. Neither student voted on the no-confidence motion, ECF Nos. 48-1 ¶ 5; 48-2 ¶ 5, although defendant Daraldik presided over it, *see* ECF No. 1-6.

For purposes of the preliminary injunction motion, the defendants are sued in their official capacities, which makes this essentially a suit against FSU. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State

11

itself." (citation omitted)). So although Denton has named five defendants in their official capacities, the real party in interest—for preliminary injunction purposes—is the university. *Cf. Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 163 (1985). And again, as a matter of Florida law, "[e]ach student government is a part of the university at which it is established." Fla. Stat. § 1004.26(1); *see also Univ. of S. Fla. Student Gov't v. Trundle*, 336 So. 2d 488, 489 (Fla. 2d DCA 1976) ("[T]he student government association is simply a part of the University.").[4] So to the extent there is a suit against the student government itself, it remains essentially a suit against FSU.[5]

---

[4] Florida law also provides that "[t]here shall be no cause of action against a state university for the actions or decisions of the student government of that state university unless the action or decision is made final by the state university and constitutes a violation of state or federal law." Fla. Stat. § 1004.26(5). The university defendants cite that to argue they cannot be sued. State law cannot immunize any defendant from § 1983 liability, so that argument fails. They also argue that the statute shows the legislature viewed student governments as separate actors. But the statute only confirms that as a matter of state law, universities give force and effect to the actions of student government and are ultimately responsible for those actions. If Universities were not ultimately responsible for the actions of their student governments, the statute would be unnecessary. Here, in any event, the university did make the action final by refusing to overturn it and depriving Denton of further review.

[5] For this reason, I need not decide at this stage whether the student defendants were state actors. They argue they are not proper official-capacity defendants. Regardless of whether they are correct on that point, the relief Denton seeks is available against FSU (though the university defendants).

Next, the university administrators are proper defendants under *Ex parte Young* because they have at least "some connection" with enforcing the challenged action. *Jacobson v. Fla. Sec'y of State*, -- F.3d ----, No. 19-14552, 2020 WL 5289377, at *13 (11th Cir. Sept. 3, 2020) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). Even if—as the university defendants argue—they had no personal involvement in the decision to remove Denton, this does not change anything. "Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity. All that is required is that the official be responsible for the challenged action." *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988); *see also Ex parte Young*, 209 U.S. at 157 ("The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether [that connection] arises out of the general law, or is specially created by the act itself, is not material so long as it exists.").

At any rate, the university defendants are responsible for the continued harm Denton alleges. They may not have cast votes on the no-confidence motion, but they recognized and enforced the removal by stopping the presidential salary and

13

removing other benefits of office (including the official email account). I conclude that the administrators are appropriate *Ex Parte Young* defendants.[6]

Finally, and for similar reasons, I reject the defendants' Article III argument. They contend that any harm is not traceable to them, so Denton therefore lacks standing. Again, the official-capacity nature makes this essentially a suit against the university, and the harm is traceable to, and redressable by, the university. And even if this were not so, Dr. Hecht had the authority to overturn the student's decision, and her decision to do otherwise—to give effect to the vote—led to the ongoing constitutional injury.

*3.*

With those issues resolved, I turn now to the meat of Denton's claim. He raises three distinct First Amendment claims: He alleges First Amendment retaliation, First Amendment viewpoint discrimination, and a Free Exercise Clause violation. He seeks the same relief as to each of the three claims. Because I conclude he has shown

---

[6] Denton also relies on *Powell v. McCormack*, which held that "although an action against a Congressman may be barred by the Speech or Debate Clause, legislative employees who participated in the unconstitutional activity are responsible for their acts." 395 U.S. 486, 504 (1969). The takeaway from that case (which did not involve § 1983) is that legislative employees do not themselves enjoy immunity under that Clause. To the extent it held that employees remain accountable for their unconstitutional acts, it is unremarkable and not particularly helpful here. University official sued in their official capacity are accountable for university actions. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity").

a substantial likelihood of success as to the First Amendment retaliation claim, I need not consider the other two claims.

To succeed on a First Amendment retaliation claim, Denton must establish that (1) he engaged in constitutionally protected activity, (2) the defendants' action caused an injury that would likely chill a person of "ordinary firmness" from continuing to engage in that activity, and (3) the defendants' actions were because of his constitutionally protected activity. *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011); *see also Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Denton easily makes this showing. Indeed, no defendant argues otherwise.[7] *See* ECF No. 48 at 14 & n.10 (arguing that the student defendants are entitled to qualified immunity—which would not preclude injunctive relief against them in their official capacities, *Hafer*, 502 U.S. at 30). They argue only that Denton lacks standing and that there was no state action.

To state the obvious, expressing one's religious views, as Denton did, is a constitutionally protected activity. And being removed from a student senate presidency, as Denton was, would chill someone from expressing himself. Last, it is clear from the video of the senate meeting (ECF No. 1-6) that Denton's removal was

---

[7] Though all seem to agree that Denton's speech was constitutionally protected and that his removal was an adverse action, defendants' counsel took no position at the hearing as to whether Denton's removal was because of his protected speech. Hearing Trans. at 34:9-17, 55:3-18.

because of his speech. These are the elements of the claim, and Denton has shown a likelihood that he will succeed on this claim.

It is no answer to say, as FSU does, that this is merely all part of the "rough and tumble" of student politics, that Denton must develop thicker skin. Hearing Trans. 28:1-4, 34:5-8. Denton is not here to complain about insults or hurt feelings. His claim is that he lost his job—his student government position—because he chose to exercise his First Amendment rights. Decades ago, when the Georgia legislature refused to seat an elected representative who criticized the Vietnam War, the United States Supreme Court did more than lament the harsh realities of politics; it held "that the disqualification of [the elected representative] from membership in the Georgia House because of his statements violated [his] right of free expression under the First Amendment." *Bond v. Floyd*, 385 U.S. 116, 137 (1966); *accord Wilson v. Houston Cmty. Coll. Sys.*, 955 F.3d 490, 498 (5th Cir. 2020) ("[E]lected officials are entitled to be free from retaliation for constitutionally protected speech."); *Jenevein v. Willing*, 493 F.3d 551, 560 (5th Cir. 2007) ("To the extent that the commission censured Judge Jenevein for the content of his speech, . . . we reverse and remand with instructions to expunge that part of the order."). As these cases show, those participating in the political process do not forfeit their First Amendment freedoms (including the right to be free from First Amendment retaliation).

16

Nor is it an answer to say, as defendants do, that nobody has a constitutional right to serve in student government. That may be true, but that is not the issue. Denton *was* serving in student government, and he had a constitutional right not to have that taken away from him based on his privately expressing his religious views. Denton, "like every citizen, has a strong interest in having the opportunity to speak his mind, free from government censorship or sanction." *Waters v. Chaffin*, 684 F.2d 833, 837 (11th Cir. 1982); *see also Elrod v. Burns*, 427 U.S. 347, 360-61 (1976) (rejecting "the notion that because there is no right to a government benefit, such as public employment, the benefit may be denied for any reason").

It is true that "a public employee's right to freedom of speech is not absolute," *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1346 (11th Cir. 2013) (citation omitted), but here Denton was speaking in his personal capacity about his religious views in a forum designed for just that. No defendant has advanced any argument that the university has a legitimate interest in regulating that speech—or in removing Denton for uttering it. I conclude that Denton has shown a likelihood of success on the merits.

**B      Denton Has Shown Irreparable Harm.**

The next question is whether Denton has shown irreparable harm. If he has not, no preliminary injunction can issue no matter how likely Denton is to succeed on the merits. *See ACLU*, 557 F.3d at 1198.

Denton points to the settled principle "that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) (quoting *Elrod*, 427 U.S. at 373 (plurality opinion)). The defendants argue that the removal already happened, and indeed it has, but that argument ignores Denton's ongoing harm. He continues to be excluded from the position to which he was elected. And the university's refusal to reinstate him continues to penalize him for his speech. *Cf. Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("The only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence.").

There is also the issue of Denton's financial injury. His position as senate president was a paid position, and absent reinstatement, he continues to miss his ongoing, weekly pay. Monetary losses like these are ordinarily not irreparable. *See id.* ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). And the defendants say "[a] monetary remedy is the exact type of remedy that can be fashioned in this instance to address Plaintiff's alleged constitutional harm." ECF No. 46 at 15. But the defendants also argue that the court is powerless to provide a monetary remedy. As to the official-capacity claims, the defendants correctly explain that the Eleventh Amendment precludes monetary

18

relief for past injury. *See Odebrecht Const., Inc. v. Sec'y, Fla. Dept. of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013). And as to the individual-capacity claims (to which the Eleventh Amendment offers no protection) they argue with some force that each defendant enjoys qualified immunity. ECF Nos. 46 at 10; 48 at 13-16.

"[C]ourts have long recognized 'extraordinary circumstances,' including the likelihood that a defendant will never pay, as one way to 'give rise to the irreparable harm necessary for a preliminary injunction.'" *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1359 (11th Cir. 2019) (quoting 11A Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013)); *accord Odebrecht*, 715 F.3d at 1289 ("[N]umerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."). Based on the defendants' arguments that they will never be amenable to a damages suit, I conclude that Denton's lost income also constitutes irreparable injury.

I have not overlooked the defendants' argument that Denton's delay in seeking relief undermines his claim. It is true that "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc*., 840 F.3d 1244, 1248 (11th Cir. 2016); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show

19

reasonable diligence."). But I do not find that Denton unreasonably waited. After the students voted him out on June 5, 2020, he sought a remedy from FSU. He wrote letters to Dr. Hecht. He tried to appeal to the student supreme court. And when it became clear that the student court was unavailable to hear his case, he asked Dr. Hecht to fix that. Denton sued only after all those efforts failed. He did so on August 31, filing his preliminary injunction motion days later.

## C.  Denton Has Shown That the Balance of Equities and Public Interest Favors Some Relief, But Not Unqualified Reinstatement.

Last are "the balance-of-the-harms and public-interest factors, which 'merge' when, as here, 'the Government is the opposing party." *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (quoting *Nken v. Holder*, 56 U.S. 418, 435 (2009)). Courts always "must pay particular attention to the public consequences of any preliminary relief it orders." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). And even where there is a strong showing on the merits, public interest can be the primary basis for denying relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23-24 (2008). On the unique facts underlying this case, this is the most difficult consideration.

There is, of course, a "strong public interest in protecting First Amendment values." *Cate v. Oldham*, 707 F.2d 1176, 1190 (11th Cir. 1983). Yet it is not clear that, on the whole, ordering Denton's unqualified reinstatement for the last few weeks of his elected term would serve the public interest. Denton's desire for

reinstatement is understandable. But the leadership role he once held—the role to which his colleagues elected him—is, as a practical matter, not the role to which he would return. His title and pay could be returned, but any meaningful ability to lead likely could not. Effective leadership requires working cooperatively with others. On this record, that seems impossible.

To put it mildly, the student senators reacted strongly to Denton's views. Regardless of how reasonable one finds those reactions, the fact remains that many were extreme and emotional. One senator could "think of no more abhorrent thing to hear coming from our senate leadership" than Denton's remarks. His discussion in the Catholic Student Union discussion group made her worry about "the safety" of senators and the whole student body. Another senator echoed the "massive outcry from the student body to remove President Denton and do right by the LGBTQ+ community." Denton's removal was necessary, one senator insisted, "so that we may begin the work to heal." That senator said that she just "do[es] not feel comfortable developing a professional relationship further [with Denton]." Another senator insisted keeping Denton "would be effectively enabling bigotry." She closed by saying that "upon thinking that I had to spend . . . another three days serving under President Denton, I immediately began to cry." *See* ECF No. 1-6 (meeting video).

One need not defend these reactions to recognize that a federal court order returning Denton to his leadership position could produce tumult and chaos. *Cf.*

*Benisek*, 138 S. Ct. at 1945 ("[T]he court reasonably could have concluded that a preliminary injunction would have been against the public interest, as an injunction might have worked a needlessly chaotic and disruptive effect upon the electoral process . . . ." (marks and citation omitted)); *cf. also Carl v. Fulton Cnty.*, No. 1:07-CV-1812-AJB, 2013 WL 12357465, at *7 (N.D. Ga. Mar. 31, 2013) ("The animosity between Plaintiff and his ultimate supervisors is far too great to require the County to place Plaintiff in such a high level job which requires close coordination with elected public officials whom he has so far bested in this litigation, and thus reinstatement/instatement would not serve the public interest."). I conclude that placing Denton back in the presidency would, in fact, cause more harm than good. It would not be in the public interest.

Some might say this only rewards the senate for its discriminatory and retaliatory action—that it allows students to "get away" with violating Denton's First Amendment rights. There is something to this point, to be sure. But the public interest considerations involve more than simply righting a wrong. There is at least some public interest in having a functioning student government. For one thing, other student organizations depend on the student legislature to allocate student-activity fees. It is unlikely that a student senate beside itself over its president's expression of Catholic views could function well enough to deliver on that duty. Moreover, other students participating in student government deserve a functional

organization too. Not everyone involved in student government is to blame for Denton's unconstitutional removal. One student senator, in fact, said he voted to remove Denton because he was no longer confident the senate could function with Denton as president. That student's vote to remove "ha[d] nothing necessarily to do with [Denton's] comments but the fact that we're here to do a job." ECF No. 1-6. Yet everyone in student government would suffer from the disruption and turmoil that would follow an injunction commanding new leadership many could not accept.

I have also considered the potential upside to Denton. His term of office, as noted above, would last only a few more weeks.[8] He has not shown substantial benefit to his being reinstated for those few weeks. He argues he wishes to speak "as senate president," but he has not shown that he would be able to effectively do so. Nor has he shown precisely how the senate president's authority differs from that of a regular student senator (which he remains to this day). There surely are differences, and presumably the senate president enjoys powers other senators do not, but the contours of those differences are not clear on this record. In short, I cannot conclude that an order directing Denton's unqualified reinstatement would serve the public interest.

---

[8] According to his motion, his term expires around October 21, 2020. ECF No. 13 at 2. In a later declaration, Denton stated that the term has been extended until approximately November 11, 2020. ECF No. 51-1 (Denton Dec.) ¶ 19, Sept. 26, 2020.

That is not to say, though, that no injunction can issue. "Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between the competing claims." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321,329 (1944)); *see also Askins*, 924 F.3d at 1359 ("The very nature of equitable power—the thing that distinguishes it from law—is its flexible and discretionary nature [and] its ability to respond to real-world practicalities . . . ."). A subsidiary benefit of the unqualified reinstatement Denton seeks would be the resumption of his pay. That aspect of the reinstatement would not cause the problems full reinstatement would, yet it would alleviate in part the ongoing harm Denton suffers as a result of the constitutional violation. And as noted above, because it is unlikely Denton will be able to recover a damages award, his continued lost pay constitutes irreparable injury.

### III.

The motion for preliminary injunction (ECF No. 13) is GRANTED in part.

1.    The university administrator defendants are enjoined from continuing to enforce or give effect to the vote to remove Jack Denton to the extent that doing so means denying prospective payment for services as student senate president. The university may satisfy this injunction by paying Denton prospectively for six hours of work per week for the remainder of the current term of student senate president.

24

2.      This injunction will take effect upon Denton's posting of security in the amount of $500 for costs and damages sustained by a defendant found to have been wrongfully enjoined. Security may be posted by a cash deposit with the Clerk of Court. Any defendant may move for additional security.

3.      This injunction binds the university administrator defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

4.      The clerk will set a telephonic scheduling conference for the week of October 19, 2020.

SO ORDERED on October 8, 2020.

s/ *Allen Winsor*_____
United States District Judge